# MAY 8, 1940

HERMAN P. ARMSTRONG V. THE STATE.

No. 20998. Delivered May 8, 1940.

The opinion states the case.

*H. R. Bishop*, of Fort Worth, for appellant.

*Marvin H. Brown*, Criminal District Attorney, and *Dayton Moses*, Assistant Criminal District Attorney, both of Fort Worth, and *Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is rape; the punishment, confinement in the penitentiary for fifteen years.

Appellant challenges the sufficiency of the evidence. Prosecutrix, Pearl Gregg, was 18 years of age and belonged to the Salvation Army. She lived with Adjutant and Mrs. McNeiland in the City of Fort Worth. Ordinarily on Saturday nights, according to her testimony, she went with Adjutant McNeiland and Samuel Allcorn to the various beer taverns for the purpose of passing the tambourine in an effort to secure money for carrying on the work of the Salvation Army in Fort Worth. During the night of May 6th she left her home about 10 o'clock with Cadet Burl Wyatt and Samuel Allcorn for the purpose of making her nightly rounds with the tambourine. The parties reached the Blue Bonnet Inn on North Main Street in the City of Fort Worth a little after midnight. Prosecutrix left the car and entered the beer garden for the purpose of passing her tambourine among the patrons. Appellant was sitting inside the tavern. Prosecutrix testified that when she came to appellant with the tambourine he told her that he had gotten into trouble and asked prosecutrix to save him. She asked appellant if he was willing to kneel there and pray. Appellant insisted that they leave the building, saying that he didn't want to be where people could watch him. Thereupon she preceded appellant and they went outside to the right of the building to a tank. When they stopped they were under the light of a Neon sign. Music was being played in the tavern and the patrons were dancing. Also there was much talking going on. After stopping by the tank, prosecutrix asked appellant if he was willing to ask the Lord to save him, saying that all he had to do was to kneel down. Appellant insisted that they go farther back where no one could watch him. She replied: "There isn't anyone around here watching you." Appellant still insisted that they go farther back, and she said: "No, I do not intend to go any farther back. If you are willing to be saved you can kneel right here because the Lord can save you right here as well as farther back." When she saw that appellant would not kneel she extended her hand, saying, "I will pray for you before I go to bed." Appellant grabbed her hand and started bending it back and dragging her toward the back of the tavern to a point where the Neon light did not extend. She endeavored to pull away from appellant, but he continued to bend her fingers to the extent that it caused her great pain. She testified that he pulled her three hundred feet.

She said she thought he was going to break her hand. While pulling her to a place where there was high grass, appellant told her that it was his intention to have sexual intercourse with her. He told her if she said anything he was going to knock her out. After reaching the place where the grass was high, appellant started disrobing her, at the same time bending her fingers back until she was in intense pain. She testified that she called one of her companions who had accompanied her to the beer garden and who had remained outside. She said: "I hollered 'Sam'. I hollered loud."

Appellant contined to bend her hand and forced her to the ground. After she had been forced to the ground appellant continued to hold her hand and got down on his knees and started taking his trousers off. She kicked him and fought him. When he got on top of her she was kicking and fighting him, and bit him on the arm. Prosecutrix weighed 114 pounds. At this juncture we quote from the testimony of prosecutrix as follows:

"I have nervous fainting spells, some times I am out and some times I am not, but I can't do anything when I have them. I felt I was going to have one of them, and I told him so, but he just started having intercourse then, and he asked me if it felt good. I told him no, he was about to kill me.

"He was trying then to make his male private part enter my female private part, but it had not completely entered when I went out. Just before I fainted I felt some pain in that particular portion. It was intense pain, and I told him he was killing me, but he kept asking me if it felt good.

"I don't know how long I lay there before I came to. When I did, I tried to raise my head up and look toward the tavern to see if I could see anybody, but whenever I'd raise my head, he would push it back to the ground.

"When I came to he was on top of me, and his male private part was on the inside of me and I was feeling pain in that area.

"When I came to I yelled 'Sam.' I kind of turned my head and I could see someone that had light trousers on out by the tavern, behind the tavern.

"When I came to his left hand was still bending back my right hand, and my hand was still in pain.

"When I yelled 'Sam,' the defendant hit me beside the head with his fist, and said if I said anything he would knock me out. My glasses were knocked off and cracked, and after that I had to have them straightened by Dr. Luck.

"When he hit me beside the head I went out then, and when I came to he was off of me and was off a few feet. I don't remember the boys running up there.

"After I saw someone in light trousers up there, and hollered 'Sam,' I did not see anyone running down there. After I hollered, I first saw the boys over from me beating the defendant up. I jumped up real quick and said, 'Sam, kill him,' and I started to find my way back to the car. I was all excited. I tried to find the tambourine but couldn't, so I started back to the car, and by the time I got there I was crying.

"I have stated that when I came to his male part was on the inside of me, and before I went out, he was trying to put it in.

"I did not consent to that particular act. I was not willing for him to do it, and I had never performed any such act before. All that period I was just scared to death.

"Prior to that time Dr. A. I. Goldberg had been waiting on me for my fainting spells. Last June I had an appendicitis operation, and I was in the hospital eleven days and in bed four weeks. When I got up my side was not healed up, and the doctor had to tape it together before it would grow together. I did not get strong quickly. I have always been inclined to be nervous, but it was not until after my operation that I had these fainting spells. Dr. Goldberg waited on me and treated me for that. I have been going to him pretty often for the last two years. It was June of 1938 that I had my operation."

Dr. A. I. Goldberg, the physician who had charge of prosecutrix at the time she was operated on, testified that at the time he operated on her, which was about a year prior to the trial, she had a hymen. He said: "We consider them virgins when they have a hymen." Further, the testimony was to the effect that the doctor made an examination of prosecutrix in ten or eleven hours after the alleged assault. He testified that the hymen was torn, saying it was a fresh tear, and that there was some serum issuing from it. Further, he testified that he examined the right hand of prosecutrix and found that it was swollen. He said: "I considered it looked like it was pressed by a thumb. It was swollen on top. It was quite a noticeable swelling." He testified that there was a slight discoloration on the left side of the head of prosecutrix. He said: "She complained of it being sore. That was right close to the temple." It was his further version that prosecutrix had for several months been very nervous and that he had treated her for nervousness. We quote from his testimony: "I have found

Miss Gregg to be a very nervous individual. In fact, I would say she is slightly emotionally unstable. By this I mean that if anything comes up she is apt to become extremely nervous and lose herself completely."

The companions of prosecutrix testified to having gone to the beer tavern with her. When they heard her call "Sam" they ran to her assistance. Appellant was on top of prosecutrix. They pulled appellant off of her and struck him several blows. Appellant said: "I know I shouldn't have done it. I am sorry." Prosecutrix said to one of them, "Sam, kill him," and then she went back to the car. Prosecutrix was hysterical at the time. They led appellant inside and called for the officers. There was money scattered on the ground, which had come from the tambourine of prosecutrix. The tambourine was not near the money, but appeared to have been kicked away in a suffle. The money was scattered over quite an area, according to the version of one of the witnesses.

Appellant testified that the act of intercourse with prosecutrix was with her consent for a sum of money. Appellant introduced witnesses who testified that it appeared to them that prosecutrix willingly went to the place where the act of intercourse occurred. Stated in another way, it was their version that appellant did not drag prosecutrix to the scene of the alleged offense.

In his motion for new trial appellant alleged newly discovered evidence, and attached the affidavits of the witnesses. Testimony was adduced upon the hearing of the motion. The affidavit of the alleged newly discovered witness Emmett Godbey, which was attached to the motion for new trial, was to the effect that he had seen prosecutrix visit beer taverns on many occasions during the nighttime; that he had seen her flirt with patrons of the taverns; that he had heard her offer to make dates wherein money was to be paid for such dates. Godbey's testimony on the hearing of the motion for new trial was, in substance, as follows: Appellant's father had married a sister of the witness' first wife. The witness saw prosecutrix at the beer tavern in February or March. Some of the patrons were "kidding her about her money," and she told them she was trying to make a living. The witness said he would not be positive that he heard prosecutrix "proposition" any boys to make a date with them at Harper's Place. The next time the witness saw prosecutrix was at the Lone Wolf Beer Tavern. He observed her pass her

tambourine among the patrons and heard her talking to some of the boys on the outside. He did not know who the boys were, but that he heard the boys ask her about making money. They asked her if she would go with men or meet them. She replied that if there was any money involved she would. The witness said he could not name any person who was at the Lone Wolf on the night in question. The witness also saw prosecutrix at the Blue Bonnet Inn, which was another beer tavern, on two or three different occasions. On those occasions she was asked by men whom the witness did not know "about making a date," and she replied that she would be interested if there was any money in it, as there was very little money in what she was doing." The witness did not know whether she made a date with these people. The witness could not name or describe any of the men who had talked to prosecutrix. He had also seen prosecutrix on Exchange Avenue. The affidavit was attached to the motion for new trial on the 19th day of July, 1939. At the time he was rooming in the house of Mrs. Beulah Clemons at 504 Grant Street, Fort Worth. After making the affidavit he left his rooming house and spent the night at the Huff Hotel in Fort Worth. He apparently registered under an assumed name at the Huff Hotel. After spending the night in the Huff Hotel, he went to Wichita Falls. He said: "I did not tell anyone where I was going when I went to Wichita Falls." After spending one night in Wichita Falls he went to Wise County and stayed with a friend for six or seven days. He said: "I was not particularly keeping my whereabouts a secret, it didn't make any difference. I couldn't say whether any human being in Fort Worth knew where I was * * * Nobody discovered and brought me back. I just took a notion to come home."

The witness testified that he was adjudged of unsound mind in Hillsboro in 1934. It was his version, however, that he was sent to an institution to be treated for alcoholism.

It appears that the hearing on the motion for new trial was postponed from time to time until the presence of the witness could be secured.

We think the trial court was warranted in concluding, under the testimony adduced upon the trial, that the alleged newly discovered evidence of the witness Godbey would not likely change the result in the event of a new trial. In Branch's Ann. P. C., Section 199, it is said: "If it is clear that the proposed testimony which is claimed to be newly discovered

would not likely change the result, a new trial sought on that ground is properly denied." It is conclusively shown by the testimony that prosecutrix was a virgin at the time she was assaulted by appellant. If she had the conversations the witness Godbey attributed to her, it is manifest from the record that she had at no time prior to the assault by appellant had sexual relations with men. If she went from beer tavern to beer tavern making suggestions to the patrons of those places, in effect, that she would be willing to have sexual relations for a price, it is passing strange that every man to whom she talked must have rejected her proposition, and left her untouched. We think that there was no abuse of discretion on the part of the trial judge in overruling the motion for new trial in so far as it was based upon the newly discovered testimony of Emmett Godbey.

Appellant also attached to the motion for new trial the affidavits of two young ladies who were sitting in an automobile near the scene of the assault. Their affidavits were to the effect that appellant did not drag or pull the prosecutrix from the tank mentioned in the testimony to the point where she was assaulted. The testimony of these witnesses would have been cumulative of the testimony of J. W. Tanner and C. W. Howell. J. W. Tanner testified that he saw prosecutrix during the entire time she was near the tank and saw her when she started to leave. It was his version that he, at no time, saw prosecutrix pull back as she and appellant left the tank to go to the point where the assault took place. C. W. Howell said "I did not see this boy grab that girl and they were in plain view of me, and when they were angling toward the packing house, I did not see this boy drag her. They were close together and he might have had hold of her. I saw no struggle of any kind, did not see this boy pushing or pulling, and saw no act on the part of that girl indicating a want of desire to go with him. I could not see their hands. I at no time saw this boy force her hand back up as far as her shoulder while they were taking that walk out there." In short, it was the version of the witness that he saw nothing on the part of prosecutrix to indicate that she unwillingly accompanied appellant to the scene of the assault. Another witness for the appellant gave testimony upon the trial substantially the same as that which the alleged newly discovered witnesses would have given. However, this witness was impeached by the State and we do not take his testimony into consideration in determining whether the rule governing

cumulative testimony should be held applicable to the testimony of the young ladies whom it is alleged were newly discovered. We quote from Branch's Ann. P. C., Section 203, as follows: "As a general rule where it appears that had the proposed new witness testified on the trial his testimony would have been merely cumulative of that adduced on the trial, it affords no ground for granting a new trial as newly discovered testimony." We think the quoted rule applicable and therefore expressed the opinion that the trial court was warranted in overruling the motion for new trial in so far as it was based upon the proposed testimony of the young ladies in question.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.